UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION - LOS ANGELES


REFLEX MEDIA, INC.,              ) CASE NO:  2:17-CV-00491-FMO-JPR
                                )
              Plaintiff,        )                CIVIL
                                )
     vs.                        )      Los Angeles, California
                                )
MARIA DEL MAR MARTINEZ          )   Thursday, October 12, 2017
SANCHEZ, ET AL.,                )   (10:03 a.m. to 10:06 a.m.)
                                )   (11:08 a.m. to 11:34 a.m.)
                   Defendants.  )
_____ )


HEARING ON PLAINTIFF'S MOTION TO COMPEL DISCOVERY


BEFORE THE HONORABLE JEAN P. ROSENBLUTH,
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For Plaintiff:          MARK L. SMITH, ESQ.
                        JOSEPH A. SCHAEFFER, ESQ.
                        Smith Correll, LLP
                        11601 Wilshire Blvd., Suite 2080
                        Los Angeles, CA 90025


For Defendants:         JOHN METZIDIS-DRENNAN, ESQ.
                        Grodsky & Olecki, LLP
                        2001 Wilshire Blvd., Suite 210
                        Santa Monica, CA 90403


Court Reporter:         Recorded; CourtSmart

Deputy Clerk:           Bea Martinez

Transcriber:            Exceptional Reporting Services, Inc.
                        P.O. Box 18668
                        Corpus Christi, TX 78480-8668
                        361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1    **Los Angeles, California; Thursday, October 12, 2017; 10:03 a.m.**

2                            **(Call to Order)**

3            **THE CLERK:**  Calling Case Number CV-17-0491-FMO-JPRx,

4    Reflex Media, Inc. versus Maria Del Mar Martinez Sanchez.

5    Counsel, please state your appearances for the record.

6            **MR. SMITH:**  Good morning, your Honor.  Mark Smith and

7    Joseph Schaeffer on behalf of Plaintiffs.

8            **THE COURT:**  All right.  Hello.

9            **MR. METZIDIS-DRENNAN:**  Good morning, your Honor.

10   John Metzidis-Drennan on behalf of Defendants.

11           **THE COURT:**  All right.  Thank you.

12           All right.  So let me tell you what I -- my thinking

13   is -- and please you can all sit -- and then you can say

14   anything you want to say and then we'll proceed.

15           So it does seem to me that the meet and confer in

16   this matter was not sufficient, not necessarily for the reasons

17   cited by the defendants but because Local Rule 37 requires that

18   when counsel are located in the same county, the meet and

19   confer take place in person and it did not take place in person

20   here from what I understand.

21           It also does seem to me, as Defendants say, that

22   there are some issues that are, if not totally resolved, fairly

23   well resolved.  So what I propose to do is to let you folks

24   meet and confer here for about 45 minutes until 11:00 o'clock

25   or until -- if you resolve everything, you can let Ms. Martinez

1   know and I can come out earlier.  But I do expect you to meet

2   and confer in good faith and to resolve several of these issues

3   because it seems like you're very close.  I thought I would

4   give you some of my thinking about the motion, otherwise, and

5   perhaps that will help you in your meet and confer.

6          I do think that Plaintiff is entitled to much of what

7   Plaintiff has asked for, although -- and when I say "much of"

8   what I mean is, in almost every interrogatory or request for

9   production it seems like there's some core of information that

10  plaintiff is entitled to.  But I do think that many of these

11  requests are overly broad, either as to timeframe or some other

12  aspect.  I also think that Defendants are correct that they can

13  only -- at least as the RFPs and also as to the

14  interrogatories, really -- they can only provide information

15  that's in their possession, custody or control.  And if things

16  that former employees did or said or not in their possession,

17  custody and control then they can't give it to Plaintiff.  So

18  that's what I propose to do.  And I'm happy to hear from

19  anybody but I don't want any argument about the merits right

20  now.  So if anybody has anything they want to say about the

21  procedure that I propose, I'm happy to hear it.

22          **MR. SMITH:**  Sounds dandy.  How's that?

23          **THE COURT:**  Okay.  All right.  That's what I like to

24  hear.

25          So I will be back here at 11:00 o'clock and you can

4

1  meet and confer here in the courtroom, unless Ms. Martinez

2  tells me that you have resolved everything earlier than that.

3        **MR. SMITH:**  Okay.  Thank you so much, your Honor.

4        **THE COURT:**  All right.  Thank you.

5        **MR. METZIDIS-DRENNAN:**  Thank you.

6        **THE CLERK:**  This court is now in recess.

7     **(Court in recess from 10:06 a.m. to 11:08 a.m.)**

8        **THE CLERK:**  Counsel ready?

9        **MR. METZIDIS-DRENNAN:**  We are.

10        **THE CLERK:**  Okay.

11     **(Pause)**

12        **THE CLERK:**  Please remain seated.  This United States

13  District Court is once again in session.  The Honorable Jean P.

14  Rosenbluth, United States Magistrate Judge, presiding.

15        Recalling Case Number CV-17-0491-FMO(JPRx), <u>Reflex</u>

16  <u>Media, Inc. versus Maria Del Mar Martinez Sanchez</u>.  Counsel,

17  please restate your appearances for the record.

18        **MR. SMITH:**  Mark Smith and Joseph Schaeffer -- good

19  morning, your Honor -- for Plaintiff.

20        **THE COURT:**  All right.  Thank you.

21        **MR. METZIDIS-DRENNAN:**  Good morning, your Honor.

22  John Metzidis-Drennan for Defendants.

23        **THE COURT:**  All right.  Thank you.

24        So what have we accomplished?

25        **MR. SMITH:**  Your Honor, we made some good progress.

1          THE COURT:  Good.

2          MR. SMITH:  And my new -- my new good friend, John,

3   and I and Mr. Schaeffer had a good conversation.  We got

4   through --

5          THE COURT:  See what meeting in person can do.

6          MR. SMITH:  Yeah.  Well, unfortunately I was out of

7   town and so someone from our Salt Lake office talked to him but

8   that's neither here nor there.

9          THE COURT:  All right.

10          MR. SMITH:  Our apologies for not doing that in

11   advance.

12          So -- and please, Counsel, correct me if I'm wrong

13   about any of this.  But on Interrogatories 8 and 17 and

14   Document Requests 8 and 9, those that they said they would

15   supplement, they will do so, including verifications by next

16   Tuesday.

17          THE COURT:  Okay.

18          MR. SMITH:  So that is no longer hypothetical.

19          THE COURT:  So -- I'm sorry, so it's Interrogatories

20   8 and 17 and then RFPs --

21          MR. SMITH:  Yes.

22          THE COURT:  -- 8 and 9?

23          MR. SMITH:  Correct, your Honor.  And those were

24   those that they had indicated in the Joint Statement --

25          THE COURT:  Right.

1          **MR. SMITH:**  -- that they would -- that they would

2     supplement.

3          **THE COURT:**  Right.  And how about any others?  If

4     we --

5          **MR. SMITH:**  So I think, if you don't mind, your

6     Honor, we may walk through the others.

7          **THE COURT:**  Okay.

8          **MR. SMITH:**  And we're going to try to do it quickly

9     for you but going to be able to give you kind of our thoughts.

10    I do think that, for example, we're willing to limit the

11    requests to the timeline of January 1, 2016 to the present.

12          **THE COURT:**  Well, if you haven't resolved any of the

13    others, such that they're off calendar, I think it's maybe more

14    efficient if I go through --

15          **MR. SMITH:**  Okay.

16          **THE COURT:**  -- what my thinking is and then you can

17    tell me why I'm wrong.  So for instance, so let's just start at

18    the beginning.

19          Interrogatory Number 2, it does seem to me that

20    you're in -- for the reasons you stated -- that you're entitled

21    to her address, except I don't see why it would be January 1 to

22    the present.  Why wouldn't it just be to whenever the complaint

23    was filed?

24          **MR. SMITH:**  And that's fine.  That's a perfectly

25    reasonable limitation.

1          **THE COURT:**  All right.  Do you have any problem with

2    that?

3          **MR. METZIDIS-DRENNAN:**  My concern was not so much

4    with the timing but the home versus work location.  This is an

5    individual.  I don't think her home address is relevant.  I

6    especially don't see how the location of her home address can

7    really be used to gather relevant information.  They seem --

8          **THE COURT:**  Well, it is my understanding that they've

9    apparently served these subpoenas that gives them these IP

10   addresses and the IP -- whatever you call them.  I'm not so

11   good with that terminology -- and that that could be linked to

12   -- they don't know where that was coming from and so they need

13   to know her home address at the relevant time.

14          Now, I do agree that there should be some kind of

15   protective order.  Is there a protective order in this case?

16          **MR. METZIDIS-DRENNAN:**  There's not but we won't have

17   any problem agreeing to one.

18          **THE COURT:**  All right.  So --

19          **MR. METZIDIS-DRENNAN:**  If it's necessary.

20          **THE COURT:**  So I can make the information subject to

21   be turned over or to be answered, you know, within seven days

22   after the protective order is entered by the court or something

23   like that.  But -- so am I understanding why you need this

24   information correctly?

25          **MR. SMITH:**  A hundred percent.

1              **THE COURT:** All right.

2              **MR. SMITH:** You've actually jumped ahead to other

3    requests as well.  So that's 100 percent right.

4              **THE COURT:** So I'd be inclined to grant that, subject

5    to the protective order and limit it to January 1, 2016.  Are

6    the -- when is -- when did this conduct -- what's the earliest

7    this conduct could have happened?  It's at some date after

8    January 1st, right?

9              **MR. SMITH:** Yeah, it's some time middle of that year.

10   And we only chose January 1 because that's when we first

11   learned of it and so we're just trying to give ourselves a

12   buffer behind that.  Because we only, your Honor, only received

13   fishing emails essentially from customers of our client's cite

14   who said, "Hey, I got this."  We don't know how many -- how

15   much longer they were out there before we first got a complaint

16   ourselves.

17             **THE COURT:** All right.

18             **MR. SMITH:** That's all.

19             **THE COURT:** Okay.  So if we do it January 1, 2016 to

20   -- When was the complaint filed?

21             **MR. SMITH:** It's in here, I'll find it.  Nine --

22   well, 1-20-17.

23             **THE COURT:** Then why don't we just make it calendar

24   year 2016.  All right.  And subject to the protective order.

25             All right.  Then as to Interrogatory Number 3 -- I

```
1   mean, this is clearly, you know, way too broad.  So it seems to
2   me that what it should be limited to would be for calendar year
3   2016 and only as to claims that the person didn't sign up for
4   the service.  I mean, because there's all sorts of ways.  One
5   -- "fraudulent" is a very big term but it seems to me what's
6   relevant is people who are complaining that they didn't sign up
7   for the service.  So does that seem reasonable?
8            MR. SMITH:  That is to us, your Honor; in fact,
9   that's better language than we were able to come up with
10  ourselves.
11           THE COURT:  You're quite the flatterer.
12           MR. SMITH:  I'm not -- I'm actually not trying to be
13  but that's actually very helpful.
14           THE COURT:  Well keep it up.
15           MR. METZIDIS-DRENNAN:  Your Honor, thank you.  That
16  seems fine.
17           I will just, as a preview of what may be to come, I
18  don't think that our client actually receives written
19  complaints that would enable them to determine that this is an
20  instance in which a customer is complaining that they didn't
21  sign up for the service but we will be forthcoming with that in
22  our response.
23           THE COURT:  Right.  And if you don't have anything,
24  you know, you don't but --
25           MR. METZIDIS-DRENNAN:  Right.
```

1        **THE COURT:**  Okay.  So the 2016 limited to (whispering

2  under breath while writing).

3        Okay.  The next is 8 which -- that's one of the ones

4  that's resolved, correct?

5        **MR. METZIDIS-DRENNAN:**  Yes.

6        **THE COURT:**  Okay.  So then nine -- I mean, you know,

7  again, I would be inclined to grant this for calendar year

8  2016.  I don't -- you know, I don't see how it -- and again, as

9  I said at the beginning, you know, it's asking for owned or

10  operated by defendants but if Sanchez and FDS don't have

11  knowledge of what their former employees do, they can't provide

12  that information.  So I mean, I guess I'm not quite

13  understanding what the dispute is here.  Why is Defendant not

14  willing to turn over this information?

15        **MR. METZIDIS-DRENNAN:**  It's more about the potential

16  broad scope of the businesses that my clients may be involved

17  with.  I think a more appropriate limitation would be limiting

18  this -- if there are other websites owned and operated by my

19  clients, limited to websites within the online dating sphere

20  and not other business activities that don't compete with

21  Plaintiff's online dating website.

22        **MR. SMITH:**  And your Honor, from our perspective,

23  that limitation is far too narrow; in part because it's not

24  really truly a competitor case.  The fishing nature of this

25  case is one in which it has essentially associated my client

1   with fraud and then links my client's intellectual property or

2   trademarks to resulting pornography sites and things like that,

3   a business in which my client's site does not participate,

4   which has the effect of damaging the trademark itself.  So any

5   form of subsequent site we think is relevant because -- one,

6   because it's not ours and could cause confusion -- and that's

7   the easy sort of competitive version -- but also because it

8   damages it by associating it with products in which with which

9   my client does not associate itself.

10         **THE COURT:**  Right.  I mean I think I tend to agree

11   with you and I -- it seems immanently reasonable to me since I

12   understand that these fishing emails were linking to numerous

13   other entities.  And if you think this information is

14   confidential, you can -- subject to the protective order -- you

15   can just label it "confidential".  So I'm going to grant that

16   but limit it to calendar year 2016 and to whatever knowledge

17   you currently have.

18         All right.  So that leads us to Number 12.  And

19   again, that has to be limited to 2016.  And then -- I mean,

20   it's a little hard to answer.  It is --

21         **MR. METZIDIS-DRENNAN:**  That is my principal objection

22   here is what is meant by "affiliated".

23         **THE COURT:**  Do you have an explanation?

24         **MR. METZIDIS-DRENNAN:**  If "affiliated" is designed as

25   websites owned and operated by --

 1           THE COURT:  Then it's --

 2           MR. METZIDIS-DRENNAN:  -- defendants then it's

 3   repetitive.

 4           THE COURT:  -- duplicative.

 5           MR. METZIDIS-DRENNAN:  So I don't know what

 6   further --

 7           MR. SMITH:  So we had a couple of suggestions, your

 8   Honor, and one of them is really -- so they come from two

 9   places and here's why affiliated is used because it's such a

10   broad term.  And let me help you understand at least our

11   thinking on that.

12           One is, a number of websites used an affiliate

13   network to drive traffic.  So --

14           THE COURT:  I'm sorry, to -- I missed the last part.

15           MR. SMITH:  To drive traffic --

16           THE COURT:  Okay.

17           MR. SMITH:  -- to that website.  So you'll have --

18   you're on Website X, Y, Z and then you'll coordinate with an

19   affiliate who then owns a website called, you know, Top Five X,

20   Y, Z sites.  And then that affiliate will drive traffic to you.

21   So those affiliates would arguably be one to argue about.  We

22   think are related to this because one of their defenses is

23   they're not really sure what's going on, someone else may be

24   doing it.  Help us figure out who's doing it then.  Right

25   though?  If it's done by an affiliate, then point us to those

1   affiliates who may be doing it.

2           Second -- secondly, and the reason "affiliate" is

3   such a broad term that matters to us -- or that we've chosen

4   here is because, as you mentioned a moment ago, there are other

5   sites that are linked apparently to these fishing email.  And

6   if this is part of a large -- what I'll call "white label

7   network"; and that is, a bunch of sites being pushed out by

8   essentially a single core group -- and there is a relationship

9   between those, then we would want to understand that

10  relationship as well.  And so for example, one of the things

11  we've discovered in our investigation is that a former board

12  member who was a board member of FDS Solutions for a little

13  over two years, is also a board member of a number of other

14  sites that we believe could be engaged in this sort of

15  behavior.  And so if there is a relationship there, we'd just

16  like to explore it.  If what we find out is it's not a thing,

17  then it's not a thing but we do think that it satisfies the

18  capable-of-leading-to-relevant-admissible-evidence standard.

19          THE COURT:  Well, which is not the standard anymore

20  but --

21      (Laughs)

22          But correct me if I'm wrong.  But under that sort of

23  reading of what "affiliated" means, they might not even be

24  aware of websites with which they're affiliated.

25          MR. SMITH:  On the second version for sure.  On the

14

1    first version they should know.  That to be part of an

2    affiliate network that is essentially formalized but on the

3    second version, if they're unaware of it, then they're unaware

4    of it.

5              **MR. METZIDIS-DRENNAN:**  Your Honor, if I may chime in.

6              My only problem here is that I think the way

7    Mr. Smith is defining "affiliated" in the second version, it

8    really changes the entire nature of the request.  I think when

9    we read the request on its face, it might appear to be simply

10   requesting, you know, websites that we own or operate or have

11   some sort of close relationship with but I think that the

12   second version of what Mr. Smith is describing is a far

13   different animal.

14             **THE COURT:**  I mean, what if we just -- I sort of am

15   coming down somewhere in the middle but what if we said

16   something -- so you're right that you've already covered owned

17   and operated.  So then if we said something like "identify

18   every other online website with which you have affiliated in

19   2016" -- because that requires some sort of affirmative act on

20   your part.  Is that acceptable?

21             **MR. SMITH:**  With only one --

22             **THE COURT:**  With -- oh, go ahead.

23             **MR. SMITH:**  Only one minor change.  So if they were

24   in fact -- if they created that former relationship in December

25   of '15, I wouldn't want that they had to actually create the

1   relationship in '16.  Does that -- does that make sense?

2           THE COURT:  So --

3           MR. SMITH:  With which they are or have affiliated

4   themselves.

5           THE COURT:  "Identify every other online website with

6           which Defendants have affiliated".

7           MR. SMITH:  Actually if we do all of 2016, your

8   Honor, I'm fine with that actually.

9           THE COURT:  All right.

10           MR. SMITH:  I'm willing to take that and just cutoff

11   the backend that I just described.

12           THE COURT:  All right.  So we're just changing that

13   to, "Identify every other online website with which Defendants

14   have affirmatively," or something, "have actively -- is that

15   all right?  "Actively --

16           MR. METZIDIS-DRENNAN:  Through some active step --

17           THE COURT:  -- "actively affiliated in 2016".

18           All right.  Number 17, I -- my understanding is that

19   aren't you -- you're answering that one, right?

20           MR. METZIDIS-DRENNAN:  Right.

21           THE COURT:  Okay, so that's moot.

22           All right.  Number 21.  Again, I would be inclined to

23   grant that, subject to a protective order for calendar year

24   2016.

25           And Mr. -- and forgive me if I'm mispronouncing this

1    -- Metzidis-Drennan?

2          **MR. METZIDIS-DRENNAN:**  Yes, thank you.  It's perfect.

3          **THE COURT:**  All right.  Is -- do you have anything

4    you wanted to say?

5          **MR. METZIDIS-DRENNAN:**  Nothing further beyond what I

6    said with regard to Special Interrogatory Nine.  I think it's

7    the same objections but you've already made a decision there.

8          **THE COURT:**  Okay.  Okay.  So RFP 9 is already

9    resolved, correct?

10          **MR. METZIDIS-DRENNAN:**  Yes.

11          **THE COURT:**  Okay.  RFP 11.  I mean, again, first I

12    would limit it to calendar year 2016.  And then I would limit

13    it to say:

14                "Produce documents sufficient to identify every

15                credit card chargeback resulting from someone's claim

16                that they didn't sign up for the service."

17          **MR. METZIDIS-DRENNAN:**  Right.  The problem I have

18    with that, your Honor -- and maybe ultimately it might not be a

19    problem -- is that from what I understand from my client, the

20    credit card chargebacks that we receive have no way of

21    identifying what the reason for the chargeback was, whether it

22    was a customer saying that they received this fishing email and

23    were duped to signing up for our website or the multitude of

24    other reasons.  It's just a chargeback that is issued from the

25    credit card company.

1        THE COURT:  But how can that be?  I mean, don't you

2   have to direct them to charge it back and wouldn't you have

3   some record of why that was done?

4        MR. METZIDIS-DRENNAN:  My understanding from our

5   client is no, don't.  That it may be a matter between the

6   customer and his credit card company but what we receive from

7   the credit card company --

8        THE COURT:  I see what you're saying.

9        MR. METZIDIS-DRENNAN:  -- does not provide a reason.

10       MR. SMITH:  And this is where it gets tricky for us,

11  your Honor, because from our perspective, I mean, the credit

12  card chargeback process is a fairly elaborate one.  You have to

13  go out to the vender, the vender says why they charged it and

14  they have to defend themselves.  The customer and the credit

15  card company and the vender all have to be a part of that

16  process.  It's a fairly well-outlined Visa, MasterCard,

17  American Express-type process.  And so for there to be no

18  information then that makes us think it -- to use his word,

19  some form of affiliate is doing that for them because all they

20  -- seems to me that all they're getting at the end is

21  essentially the chargeback receipt, the acknowledgement that a

22  chargeback has taken place without the -- without participating

23  in the investigation process for the chargeback.

24       THE COURT:  Well, look.  Then you can ask some kind

25  of interrogatory or get this information through -- through the

1   answer to the other one about who their affiliates are.  But

2   either they can answer the question or they can't.  I mean, but

3   -- so --

4           **MR. METZIDIS-DRENNAN:**  And that might be it.

5           **THE COURT:**  All right.  So I'm just going to say it's

6   granted for calendar year 2016 but limited to chargebacks

7   resulting from someone's claim that they didn't sign up for the

8   service.

9           All right.  So Number 8 of the RFPs.  This is one

10  that's resolved, right?  Am I correct about that?

11          **MR. SMITH:**  I believe it's not, your Honor.

12          **THE COURT:**  Oh.

13          **MR. SMITH:**  I think rest of these regarding -- oh,

14  I'm sorry.

15          **THE COURT:**  I think there were no --

16          **MR. SMITH:**  Yes.

17          **THE COURT:**  -- no responsive.

18          **MR. SMITH:**  Yes, absolutely.  I'm sorry.  My

19  apologies.

20          **THE COURT:**  All right.  So then RFP Number 3:

21          "Produce documents identifying all sources and

22          amounts of income received by Sanchez in 2016."

23          It does seem to me that that's overly broad so do you

24  have a proposal for how you would limit it?

25          **MR. SMITH:**  I think that it would be -- what we

1  propose is this.  We think -- we've identified on a proxy

2  server the websites that we think are linked to -- Cloudflare

3  is a proxy server.  The websites that are linked to essentially

4  these email.  And so it's essentially the list of all the

5  places the email are directed.  If we get -- if and after we

6  get the list of websites and URLs, we can compare it to that

7  list and then have them produce this information on the basis

8  of those things that hit on that list.  Does that -- does that

9  make sense?

10         THE COURT:  Right, it does.  So basically what you

11  want is the income from the affiliated websites and -- or owned

12  or operated websites.  So what about if I -- which seems to me

13  to be reasonable.  So what if I just ordered the parties to

14  meet and confer further concerning this RFP after the

15  production is made.  And then if you can't resolve it you can

16  call up Ms. Martinez and ask to speak to me.

17         MR. SMITH:  So the only concern we have there is --

18  because numerous extensions were granted on discovery, we're

19  running out of time on our discovery.  If you're willing to

20  continue to have that discussion and subsequent hearing as a

21  continued hearing on this so that we haven't blown our

22  deadline --

23         THE COURT:  Well, I'm certainly willing --

24         MR. SMITH:  -- we're happy to do that.

25         THE COURT:  -- to do that.  I don't know -- it's

1    Judge Olguin or who is it?

2             MR. METZIDIS-DRENNAN:  Judge Olguin, yes.

3             THE COURT:  Yeah.  I don't know what his policies are

4    so --

5             MR. METZIDIS-DRENNAN:  I know what his policies in

6    the standing order are but I --

7             THE COURT:  And what -- can you remind me?

8             MR. METZIDIS-DRENNAN:  The motions to compel

9    discovery need to be filed sufficiently in advance so that you

10   can obtain relief before the discovery cutoff.

11            THE COURT:  Well, I think -- you know, I think though

12   -- and, you know, I obviously know Judge Olguin.  And I think

13   that if you told him that what my order was relating to this, I

14   think he would be okay with that and --

15            MR. METZIDIS-DRENNAN:  My only concern, your Honor,

16   is just the wholesale opening of discovery or extension of the

17   discovery cutoff.  If it's limited just to resolving this issue

18   regarding financial information and finding some way to come up

19   with a narrowly --

20            THE COURT:  Well that's all I've said.

21            MR. METZIDIS-DRENNAN:  Right.

22            THE COURT:  That there would be a further meet and

23   confer on so far.  I mean, we can go through the rest but

24   I'm --

25            MR. SMITH:  The rest were actually on this issue,

1    your Honor, so I think that that would cover it.

2         THE COURT:  All right.  Well let me -- so let's go

3    back to that but.

4         So RFP Number -- I mean, I don't want -- I do think

5    that Plaintiffs are entitled to some of that information and I

6    don't want them to be prejudiced because you didn't give them

7    what they needed and the discovery cutoff date is here.  So I

8    think that, you know, Judge Olguin would -- I can't speak for

9    him but it seems to me he would understand that.  So this is

10   (indisc.) kind of same thing as you said.

11        MR. METZIDIS-DRENNAN:  Yeah, your Honor.  With regard

12   to RFPs 3, 4, 6 and 7, those are all the financial document

13   requests, I'm fine with the proposal to continue to meet and

14   confer and --

15        THE COURT:  All right.  So 3, 4, 6 and 7?

16        MR. METZIDIS-DRENNAN:  Yes.

17        THE COURT:  All right.  And so -- so what's going to

18   happen is, when I make my order about when all this stuff has

19   to happen, you know, I'm going to order you folks to submit a

20   proposed protective order by "X" date.  Then Defendants are

21   going to have to produce everything within, you know, "X"

22   number of days from when I enter the order.  And then you'll

23   have -- I'll make a certain amount of time for you to meet and

24   confer concerning these RFPs.

25        THE COURT:  Okay.

1          MR. METZIDIS-DRENNAN:  Thank you.

2          THE COURT:  So now we're up to something else here.

3  Is that everything else or is there more?

4          MR. METZIDIS-DRENNAN:  I believe that's it.

5          MR. SMITH:  That is it, your Honor.

6          THE COURT:  All right.  Let's see if I can just

7  double-check.  Yeah.

8          Okay.  So by when can you submit a proposed

9  protective order?  Today is the 12th.

10          MR. SMITH:  I mean, it's a fairly simple process for

11  us.  We routinely just pull the one that the Northern Districts

12  sent out --

13          THE COURT:  Yeah.

14          MR. SMITH:  -- three, five years ago.  So --

15          THE COURT:  The only thing that I would say about

16  that one that you need to read through and amend is that theirs

17  applies to trial as well, whereas the ones in this district are

18  only for discovery-related proceedings.  And you have to get a

19  new -- you have to talk to the district judge when trial rolls

20  around.

21          MR. METZIDIS-DRENNAN:  Right.

22          THE COURT:  So if you can modify it to make it clear

23  that it's only related to discovery-related proceedings.

24          MR. SMITH:  We can pull one from the Central District

25  as well.  I'm sure we have one.  We use so many --

1          **THE COURT:**  There's one on Judge Chooljian's website

2   that I -- I haven't looked at it super closely but I think it's

3   pretty good.  So --

4          **MR. SMITH:**  That's perfect.  Well, you see, we try to

5   make this easy because that way the hard objective we're

6   pulling from the court.

7          **THE COURT:**  There you go.  Exactly.  So does that

8   mean by Monday you can submit it or --

9          **MR. SMITH:**  So here's -- just unfortunately here's

10  the rest of my week.  I've got a deposition tomorrow and a

11  hearing on Monday.  So if you could give me till Tuesday that

12  would be much better.

13         **THE COURT:**  Do you have an objection?

14         **MR. METZIDIS-DRENNAN:**  I was going to suggest

15  Wednesday if that's possible.

16         **THE COURT:**  All right.  We'll say Wednesday so --

17         **MR. METZIDIS-DRENNAN:**  I have a few things myself.

18         **THE COURT:**  All right.  So Wednesday, that would be

19  the 18th for the proposed protective order.  Then Defendants

20  are going to -- how long after -- and I'll try to look at it

21  right away.  But how long after I enter the order would you

22  need to respond to everything I've ordered?

23         **MR. METZIDIS-DRENNAN:**  If I could have 14 days I

24  would appreciate that.  Your Honor had talked about seven --

25         **THE COURT:**  Because the discovery cutoff is -- was

```
 1    the -- it's the 16th, correct?

 2              MR. METZIDIS-DRENNAN:  Yes.

 3              THE COURT:  Why don't we make it 10 days?

 4              MR. METZIDIS-DRENNAN:  All right.

 5              THE COURT:  All right.  So then 10 days after I enter

 6    the PO.

 7              MR. METZIDIS-DRENNAN:  And I believe that we had

 8    already discussed it with regard to the four requests that are

 9    moot.  Those, I'd be providing by next Tuesday and that still

10    stands.

11              THE COURT:  Oh, okay.

12              MR. METZIDIS-DRENNAN:  That's fine.

13              MR. SMITH:  But yeah, I mean, for us we can -- we can

14    push that out as well because --

15              MR. METZIDIS-DRENNAN:  Okay.

16              MR. SMITH:  Yeah, I don't want to make you have to do

17    things twice so --

18              MR. METZIDIS-DRENNAN:  Yeah, okay.

19              THE COURT:  All right.  So --

20              MR. SMITH:  Yeah.

21              THE COURT:  So you'll just have everything due by --

22    okay, good.  Thank you for that.  That's very reasonable.

23              All right.  And so then after he produces, how about

24    you have -- how long do you need to then meet and confer

25    concerning the four remaining RFPs?
```

1      **MR. SMITH:**  I think it'll be -- I think five days

2  would be plenty.

3          **THE COURT:**  Five days?

4      **MR. SMITH:**  If there are five -- well --

5          **THE COURT:**  I'll give you seven so that'll give you

6  a --

7      **MR. SMITH:**  Yeah, if we do seven 'cause that gives us

8  a weekend.

9          **THE COURT:**  A week to meet and confer re the four

10  remaining RFPs.  And then if the parties can't -- which I hope

11  they can but if they can't come to a resolution concerning

12  those four, you -- I'll give you a total of 10 days.  So that's

13  three days after the meet and confer is supposed to have taken

14  place at some point to call Ms. Martinez and to schedule -- to

15  ask for some kind of hearing.  And if I don't hear within that

16  amount of time then I'm just going to assume everything's

17  resolved.

18          **MR. SMITH:**  So I want to be sure I understand that

19  correctly.  Plus 10 --

20          **THE COURT:**  So --

21      **MR. SMITH:**  Meet and confer plus three.

22          **THE COURT:**  He produces everything.  So within 10

23  days after I enter the protective order --

24      **MR. METZIDIS-DRENNAN:**  Correct.

25          **THE COURT:**  So then you have --

26

1          **MR. SMITH:**  Plus seven.

2          **THE COURT:**  -- a week -- right.  A week to meet and

3   confer and 10 days from when he produces to request a

4   conference with --

5          **MR. SMITH:**  Plus three more.  I just -- I want to be

6   sure because I accidentally wrote plus 10 there and --

7          **THE COURT:**  No, no, plus three more.

8          **MR. SMITH:**  -- I didn't want that to balance out.

9   Plus three.  Got it.

10          **THE COURT:**  All right.  And we'll issue some kind of

11   minutes that sets all of that out.

12          Is there anything further?

13          **MR. SMITH:**  Nothing, thank you so much, your Honor.

14          **MR. METZIDIS-DRENNAN:**  Thank you, your Honor.

15          **THE COURT:**  All right.  Thank you.

16          **MR. SMITH:**  Appreciate your time.

17          **THE COURT:**  You're welcome.

18          **THE CLERK:**  This court is now adjourned.

19          **(Proceeding adjourned at 11:34 a.m.)**

20

21

22

23

24

25

**CERTIFICATION**

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    _December 18, 2017_

                    TONI HUDSON, TRANSCRIBER